**SIGNED THIS: October 31, 2008**

_____
THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SVI MEDIA, INC. | ) | No. 07-82762 |
| a Nevada corporation, | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| OXFORDSVI, INC., | ) | No. 07-82763 |
| an Illinois corporation, | ) | |
| Debtor. | ) | |

### O P I N I O N

This matter is before the Court on the applications of Debtors' counsel, Barash & Everett, LLC ("B&E"), for an award of attorney fees and costs, to be paid out of prepetition retainers, as well as the applications of the Chapter 7 Trustee to retain Barry M. Barash of B&E to represent the Trustee.

The Debtors, SVI Media, Inc. ("SVI") and OxfordSVI, Inc. ("OXFORD") filed voluntary Chapter 11 petitions on December 7, 2007. SVI is the parent of OXFORD, the

main operating entity. The affairs of the Debtors were commingled, to some extent, but the estates have not been substantively consolidated. The cases were converted to Chapter 7 by orders entered June 16, 2008.

Pursuant to the written representation agreements (the "Agreements") between B&E and each of the Debtors, OXFORD paid B&E a retainer of $66,461 and SVI paid B&E a retainer of $7,500. The word "retainer" is used without definition or elaboration. The Agreements, the language of which is identical, further state that "one-third of your prepayment to us of attorney's fees . . . shall become the immediate property of the firm and may be deposited in our operating or business account and not in the firm's client trust account to apply against pre-petition legal work, petition preparation and filing." The Agreements further state that the balance of the retainer "will be deposited in our trust account and will not be disbursed without a prior order of the bankruptcy court." They further provide that if B&E's services are terminated, it will only retain that portion of the "fee advance or retainer" that is "reasonable in light of the services . . . performed," with the unearned remainder refunded to the client.

The Agreements go on to provide that attorney fees will be charged on an hourly basis at specific hourly rates set forth in a table of hourly rates. They also state that B&E's time is billed in increments of 1/10th of an hour, that by way of example, "short" telephone calls will be billed at 1/10th of an hour, and that a letter or e-mail is "usually" billed at 3/10ths of an hour. The Agreements state that all fees and allowances are subject to court approval.

Shortly after the cases converted, B&E filed its joint Application for Allowance of Attorney's Fees, Expenses and Costs (the "Fee Application"). No previous applications for

fees have been filed. The Fee Application asserts that attorney fees and costs have been incurred in the SVI case of $31,459.74, in the OXFORD case of $21,339.65 and in two adversary proceedings of $1,979.20, for a total of $54,778.59. The Fee Application shows a credit against this sum of $26,039.00 leaving a balance due of $28,739.59. B&E requests an order approving the total amount of fees and costs, approving the prior payment of one-third of the retainers, authorizing the transfer in the amount of $28,739.59 from the balance of the retainer payments to B&E, and seeking directions for disposition of the remaining trust account funds.

No written objections to the Fee Application were filed, but the attorney for the United States Trustee ("UST") appeared at the hearing held on August 4, 2008, and raised several objections. She objected to compensation for the adversary proceedings, she questioned whether 104 time entries billed at .3 should be reduced to .2 or .1, she questioned the reasonableness of B&E's Mayo Clinic staffing model, and she questioned whether certain paralegal time entries should be treated as non-compensable secretarial time. After hearing argument, the Court took the matter under advisement.

Subsequently, on August 25, 2008, Charles E. Covey, the Chapter 7 Trustee appointed in both cases ("Trustee"), filed applications to retain Barry M. Barash of B&E as special counsel for the estate to "review the schedules and investigate and pursue any possible preferences, fraudulent conveyances or transfers, accounts receivables and any other actions pursuable under §§ 547, 548 and 549 of the U.S. Bankruptcy Code for the benefit of the bankruptcy estate," on a one-third contingent fee basis. The Trustee's applications disclose that B&E represented the Debtors in Chapter 11 and currently

represents them in the converted Chapter 7 cases. The applications also disclose that B&E is holding $100,000 in trust as an earnest money deposit from DCH Group, a party formerly interested in purchasing the Debtors or their assets. The applications further disclose that ownership of the earnest money is in dispute.

The UST filed an objection to the Trustee's applications to retain Mr. Barash for the purpose of clarifying that all issues relating to the disputed earnest money, and any litigation that might occur with respect thereto, are outside of the scope of employment contemplated in the Applications. Neither the Trustee nor B&E expressed any disagreement with the UST on this point.

## ANALYSIS

**A. Retainer Identification**

The first issue concerns the nature and permissibility of the split retainer used in these cases. At the hearing, the Court expressed uncertainty about the nature of the retainer taken by B&E in these cases. B&E represented that the purpose of the one-third immediate vesting provision was to avoid the delay in being able to access and use the funds to pay law firm overhead and expenses that would occur if 100% of the retainer was deposited in B&E's trust account. B&E acknowledged that no portion of the retainer amounts was intended to be an earned in advance flat fee. Rather, B&E intended to charge its fees on an hourly basis against the entire amount of the retainers.

The unmodified term "retainer" is inherently ambiguous. Recently, the Illinois Supreme Court addressed that ambiguity in *Dowling v. Chicago Options Associates, Inc.*, 226 Ill.2d 277, 875 N.E.2d 1012 (2007), in which it recognized the validity of three types of

retainers. The "classic retainer," paid to secure the lawyer's availability, is earned when paid and ownership of the funds passes to the lawyer upon payment. A "security retainer" serves as a collateral fund to secure payment of fees for future services that the lawyer is expected to perform. *In re McDonald Bros. Const., Inc.,* 114 B.R. 989, 999 (Bankr.N.D.Ill. 1990). It remains the property of the client until the lawyer applies it to charges for services that are actually rendered. Pursuant to Rule 1.15(a) of the Illinois Rules of Professional Conduct, a security retainer must be deposited in a trust account and kept separate from the lawyer's own funds. *Dowling*, 226 Ill.2d at 286.

An "advance payment retainer" is yet a third type of retainer where, like a classic retainer, ownership of the fund passes to the lawyer upon payment. It is characterized by a payment, in advance of certain specific, contemplated legal services, that is intended to pay the fee for those services. Perhaps the most typical example of an advance payment retainer is a flat fee agreement.[1]

If an advance payment retainer is used, the written agreement between the client and the lawyer must use that exact term to identify the retainer, "must contain language advising the client of the option to place his or her money into a security retainer" and "must clearly advise the client that the choice of the type of retainer to be used is the client's alone." *Dowling,* 226 Ill.2d at 294. In addition, the written agreement "must set forth the special purpose behind the retainer and explain why an advance payment retainer is advantageous to the client." *Id.*

While recognizing advance payment retainers as permissible, the Illinois Supreme Court expressed disfavor with them, stating that they should be used "only sparingly,

---

[1] *See, Dowling,* 226 Ill.2d at 290, quoting from the ARDC's Client Trust Account Handbook.

5

when necessary to accomplish some purpose *for the client* that cannot be accomplished by using a security retainer." *Id.* at 293 (emphasis added). The client's interest ordinarily dictates that retainer funds must be held in the attorney's trust account as a security retainer. *Id.* at 292. If the written agreement between the client and lawyer is ambiguous, the agreement must be construed as providing for a security retainer. *Id.* at 294-95.

Under the analytical roadmap set forth in *Dowling,* the retainers that each of the Debtors paid to B&E in these cases, must be characterized as security retainers. The Agreements use the word "retainer" generically, without identifying the specific type of retainer intended, and are ambiguous in that regard. They make no reference to the term "advance payment retainer" and contain none of the disclosures required by *Dowling* for such retainers. The Agreements clearly contemplate that all of B&E's fees are billed on an hourly basis, not as a flat fee. B&E affirmed this hourly methodology, with respect to both prepetition fees and postpetition fees, at the hearing. Moreover, improving the law firm's cash flow is an insufficient justification for use of an advance payment retainer. Accordingly, the entire amount of the retainers, properly treated as security retainers, should have been deposited in B&E's client trust account.[2]

**B. Retainer Aggregation**

Along with the Fee Application, B&E submitted its billing records, showing all time billed by attorneys and paralegals with a description for each entry and a corresponding time amount. Separate records were maintained for each of the two related, but not consolidated, bankruptcy cases.

---

[2] The retainers at issue in these cases are unusual in that they purport to be a hybrid, with a portion of the retainer amount being property of the client, and a portion property of the attorney. Nothing in *Dowling* indicates that a hybrid or split retainer is recognized by the Illinois Supreme Court. Even if permissible in theory, given the strict focus on the benefit to the client of advanced payment retainers, it is doubtful that such a retainer would be acceptable as part of a hybrid.

6

As indicated above, OXFORD paid B&E a retainer of $66,461, while SVI paid $7,500. In the Fee Application, as supported by its billing statements, B&E summarized its billings as $21,339.65 in fees and costs for work performed in OXFORD'S case and $31,459.74 in SVI's case. Without explanation, the Fee Application assumes that the separate retainers paid by OXFORD and SVI may be aggregated so that, in effect, the larger retainer paid by OXFORD may be used to pay fees and costs charged to SVI. B&E has submitted no authority to support this assumption.

It appears to the Court that what can be said in favor of B&E's retainer aggregation theory is that the Debtors are related in that OXFORD owns the stock of SVI; that the Debtors pursued a common business enterprise; that the bankruptcy cases have proceeded in tandem, driven largely by the interests of the same major secured creditors; that the legal services provided to the Debtors by B&E overlapped; and that under these circumstances the cases are better treated jointly rather than separately.

To the contrary, the cases were filed as separate Chapter 11 cases and that separation has been maintained; the estates have not been substantively consolidated; separate retainers were paid; B&E voluntarily accepted the retainers, both in terms of amounts and with full knowledge of the separateness of the funds; the creditors of each Debtor differ markedly – OXFORD scheduled $1 million in unsecured claims while SVI scheduled $24 million; and the Chapter 7 Trustee will administer each estate separately.

This Court is not aware of any authority that would permit the aggregation of separate retainers without substantive consolidation of the estates. Having determined that the retainers are security retainers, the OXFORD retainer is property of its estate, and

the SVI retainer is property of its estate.[3] Without substantive consolidation, OXFORD'S assets may only be used to pay its creditors and SVI's assets may only be used to pay its creditors. This fundamental premise overrides all circumstantial factors to the contrary. The retainer aggregation proposed in the Fee Application must be denied.

**C. Reasonableness of Fees**

One of the issues raised by the UST pertains to B&E's staffing methodology. In these cases, B&E followed its routine practice of involving paralegals in large cases, primarily Doug Main and Jennifer Allgeyer, to assist lead attorney Barry Barash. While Mr. Barash does not operate as a solo practitioner, he regularly relies upon his team of experienced paralegals, as opposed to other attorneys in his office, to perform tasks that other firms might use associate attorneys to perform. To the extent that paralegals are billed at a lower rate than associate attorneys, as a general matter, it is difficult to fault B&E's longstanding practice from the perspective of reasonableness of fees.

The more particular issues in this regard are the reasonableness of the attendance at hearings or meetings by Mr. Barash and two paralegals (i.e., triple staffing); the necessity of attendance of any paralegals at particular hearings or meetings; and whether some time billed by paralegals should be recharacterized as noncompensable secretarial work.

The OXFORD billing statement reflects triple staffing at a 5 hour office meeting on 11/29/2007, with Mr. Barash, Mr. Main and Ms. Allgeyer all attending the meeting, which appears to be the initial meeting with counsel for the major creditors. This appears to be the only instance of triple staffing in either case. Since it occurred at the initial substantive

---

[3] The ownership transferring provision in the Agreements as to one-third of each retainer, is not a permissible feature of a security retainer and must be considered void and of no effect.

meeting in the case, this Court is satisfied that triple staffing in that instance was not unreasonable.

The other instances of potential overstaffing or billing for secretarial work raised by the UST will be addressed individually. In SVI, the entries on 12/14/2007 and 12/18/2007, involving compilation of creditor names and addresses and preparation of the creditor matrix, and then the schedules and statement of financial affairs, work that was performed by four different paralegals, but for which no attorney time was billed, is not unreasonable in light of the size and complexity of these cases.

In SVI, Mr. Main attended a hearing with Mr. Barash on 3/24/2008 and billed 3.5 hours for it, the same as Mr. Barash. As Mr. Barash did not regularly use an associate attorney for assistance in the case, but did regularly use Mr. Main, his use of Mr. Main to accompany him to court for certain important hearings is not unreasonable.

On 4/25/2008, associate attorney Brad Keefner sat in with Mr. Barash on a conference call regarding the asset purchase agreement and Cantone's bid. He performed no other work on the file. Therefore, the Court concludes his participation was unnecessary and provided no added value to the client or the case. He billed 1.25 hours at $125.00 per hour for a time value amount of $156.25, which will be disallowed as neither necessary nor reasonable.

In the OXFORD case, the time spent on 12/14/2007 by Mr. Main and paralegal Sally J. Keener for the creditor matrix preparation is reasonable given the size and complexity of the case. On 12/17/2007, Mr. Main accompanied Mr. Barash to court for the hearing on first day motions. On 12/19/2007, he accompanied Mr. Barash to court again for the

continued hearings on those motions. He billed 4.5 hours and 3.5 hours, respectively. The Court finds Mr. Main's involvement at those critical hearings to be reasonable.

On 2/05/2008, paralegal Pam Mangieri mailed out a motion to 85 parties. She billed 1.0 hour in the OXFORD case and 1.0 hour in the SVI case for the work. As secretarial work, that time must be disallowed in both cases.

The UST's remaining objection pertains to the minimum time increment used by B&E for simple tasks. The UST asserts that B&E, with few exceptions, billed simple tasks at a minimum of .3 hours rather than using smaller, more appropriate entries of .2 or .1. The UST asserts that 104 such entries are at issue and that reducing the entries would result in a fee reduction to SVI of $3,120 and to OXFORD of $990. B&E indicates it is looking to the Court for direction on this issue. The Agreements between B&E and the Debtors contemplate a simple task billing increment of less than .3 hours, providing, by way of example, that a "short telephone call" is billed at .1 hours.

Hourly billing presumes that the amount of time a lawyer writes down on his time sheet is a reasonably accurate reflection of the time actually spent on a specific task. This concept becomes blurred, however, when simple tasks are performed that take just a few minutes. To the Court's knowledge, law firms and individual lawyers follow varying customs regarding minimum billing. The Court sees use of .1, .2, .25 and, less commonly, .3 as a customary minimum increment. To some extent the efficiencies afforded by technology have enabled lawyers to spend less time on simple tasks. Sending a short email may take 2 or 3 minutes. Reading one may take 30 seconds.

Billing discretion must be exercised. Attorneys seeking compensation on an hourly basis have an obligation to make a good faith effort to exclude from a fee request time that

is excessive, redundant or unnecessary. *Board of Trustees of Hotel and Restaurant Employees Local 25 v. JPR, Inc.,* 136 F.3d 794, 800 (D.C.Cir. 1998). Proper billing judgment may also require the lawyer to voluntarily reduce a fee for services that conferred a negligible benefit or were excessive in light of the result ultimately achieved for the client, and where write-offs are made, the fee application should disclose that.[4] *In re Copyboy Publications, Inc.,* 2008 WL 2235348 (Bankr.E.D.Va. 2008).

Lawyers also should, and most presumably do, exercise discretion with respect to whether an activity is so minimal that it shouldn't be recorded or billed at all. It used to be the norm that a lawyer didn't bill for the ministerial task of opening and reading the mail every day. Yet with many communications now being made by email, that norm has eroded, and attorneys often bill for "receipt of email" or "review email" even if no accompanying action was taken. Billing discretion must nevertheless be exercised to defer billing for nonsubstantive communications and ones that are just so brief or inconsequential that they should not be recorded. Also, paralegals who bill their own time should be advised by their supervising attorneys that they, too, must exercise billing discretion.

With respect to B&E's statements, it is impossible to identify which telephone calls, emails and letters occupied 6 minutes (or less) of time and which took 12 or 18 minutes. Given that the Court most often sees lawyers use a minimum increment of less than .3 for simple tasks, and in light of the efficiencies available through technology, this Court is not willing to adopt a policy that .3 hours is an acceptable minimum for all tasks no matter how brief.

---

[4] B&E's statement for SVI includes one entry on 04/04/2008, for a telephone conference for which no charge was made. No other write-offs or write-downs are reflected in the billing statements.

In these cases, the Court will resolve this dilemma by reducing each of the many entries recorded at .3 to .2, unless the stated activity is for something other than a phone call, letter or email, or unless the description indicates that the activity likely took more than 12 minutes.  In the OXFORD case, 24 entries by Mr. Barash are affected, 2 by Ms. Allgeyer and 2 by Ms. Mangieri.  The value of the total reduction for these entries is $764.00.  In SVI, after reviewing each of the 108 time entries entered at .3, the Court determines that 65 of them do not contain enough detail to indicate a likelihood that close to 18 minutes of time was spent on the described activity, and those entries should be reduced from .3 to .2.  Of the 65 entries at issue, 57 are those of Mr. Barash, 6 are those of Ms. Mangieri, and 2 are Ms. Allgeyer's.  The value of the total reduction for those entries is $1,798.00.

The Fee Application also seeks fees and reimbursement of costs for two adversary proceedings initiated by B&E prior to conversion.  For a complaint filed against Leaf Financial, fees are sought of $120 and costs of $250.  For a complaint filed against Canadian Imperial Bank, fees are sought of $1,350 and costs of $259.20.  Both complaints were filed without prior notice or Court approval, a practice that this Court disapproves.[5]

Disregarding the impropriety of the adversary filings, paragraph 7.00 of the Agreements provides that adversary litigation would be performed on a contingent fee basis, plus costs.  The adversary against Leaf Financial, naming SVI as the plaintiff, was

---

[5]While a Chapter 7 Trustee has a duty to investigate the debtor's affairs, and to identify and pursue avoidance actions, a Chapter 11 debtor in possession ("DIP") has no such duty.  The Code clearly excludes a DIP from the duty to investigate the financial affairs of the debtor or to collect and reduce to money the property of the estate. 11 U.S.C. §§ 1107(a), 1106(a)(2), (3) and (4) and 704(a); 7 COLLIER ON BANKRUPTCY ¶ 1107.02[2][b] (15th ed.rev.).  In cases that begin under Chapter 11 and then convert to Chapter 7, a DIP's preconversion initiation of avoidance actions effectively usurps the independence and authority of the Chapter 7 Trustee.  Furthermore, there is almost never a business justification for a Chapter 11 DIP to file avoidance actions. *Gleischman Sumner Co. v. King, Weiser, Edelman & Bazar,* 69 F.3d 799, 801 (7th Cir. 1995) (Easterbrook, J.).

filed March 12, 2008, and dismissed on April 14, 2008, without recovery. No fee was earned and the costs of $250 are not recoverable. The adversary against Canadian Imperial Bank, naming both SVI and OXFORD as co-plaintiffs, was filed on March 27, 2008, and remains pending. No recovery has been made and no fees have been earned. The costs of $259.20 may be recoverable if and when a recovery for the estates is realized.

For the foregoing reasons, the fees and costs chargeable in the OXFORD case must be reduced by $864, from $21,339.65 to $20,475.65. The fees and costs chargeable in the SVI case must be reduced by $2,064.25, from $31,459.74 to $29,395.49.

Debiting the fees and costs allowed in the OXFORD case of $20,475.65 against the $66,461 retainer paid by OXFORD leaves a retainer balance of $45,985.35. Applying the full $7,500 retainer paid by SVI against the allowed fees and costs of $29,395.49 leaves unpaid fees and costs in the amount of $21,895.49. B&E has an unpaid claim in this amount against SVI, which affects the Trustee's application to employ special counsel.

**D. Retention of Counsel**

The Trustee's application is purportedly brought pursuant to both Sections 327(a) and (e). The purpose of the retention is to delegate to a private attorney the task of identifying, evaluating and pursuing avoidable transfers made by OXFORD and SVI. Chapter 7 Trustees have the duty to perform such a task in every Chapter 7 case and often do so without the assistance of outside counsel. It follows that since the proposed retention is for the purpose of representing the Trustee in carrying out one of the Trustee's primary duties in conducting the cases, Section 327(a) governs the application, not Section 327(e).[6]

---

[6] The legislative history supports the view that Section 327(e) does not authorize the employment of an attorney who represents or represented the debtor generally to represent the estate generally or to represent the trustee in the conduct of the case. *In re Omegas Group, Inc.*, 195 B.R. 875, 879 (Bankr.W.D.Ky. 1996). It indicates that subsection (e) will most likely be used when the debtor is involved in complex litigation where changing attorneys would be detrimental to the progress of that separate litigation. *See* House Report No. 95-595, 96th Cong., 1st Sess. 328 (1977); Senate Report No 95-989, 95th Cong. 2nd Sess. 38 (1978); U.S. Code Cong. & Admin. News 1978, p.5787.

13

Section 327(a) imposes a requirement of disinterestedness upon the professional to be hired thereunder. A disinterested person must be a person who "is not a creditor." 11 U.S.C. § 101(14). One who holds a claim is a creditor. 11 U.S.C. § 101(10)(A). Creditor status disqualifies a person from retention under Section 327(a). *U.S. Trustee v. Price Waterhouse,* 19 F.3d 138, 141 (3rd Cir. 1994); *In re Princeton Medical Management Inc.,* 249 B.R. 813 (Bankr.M.D.Fla. 2000). Since B&E is a creditor of SVI, Mr. Barash is disqualified from representing the Trustee in the SVI case. Because SVI and OXFORD are so closely connected, the same result should apply in OXFORD'S case. It should also be noted that Mr. Barash is likely to be a material witness in the litigation concerning the $100,000 earnest money deposit.

Moreover, under the circumstances, this Court fails to see how an attorney who represents two related debtors such as here, can pass the disinterestedness test of 11 U.S.C. § 101(14)(C), given the potential for intercompany transfers, in addition to the ever present possibility of transfers to insiders with whom the debtor's attorney had a substantial relationship. A debtor's Chapter 11 attorney presumably investigates the activities of the debtor and its transactions with related entities and insiders and gives advice as to how to proceed. If after conversion, the Chapter 7 trustee hires the same attorney to review the case for avoidance actions, the attorney is simply not in a position to independently review the debtor's conduct prior to and during the Chapter 11 proceeding. *In re Omegas Group, Inc.,* 195 B.R. 875, 879 (Bankr.W.D.Ky. 1996). The trustee is entitled to and must demand a fresh set of eyes. This furthers the purpose of Section 327 by preventing even the appearance of a conflict of interest, which purpose should be protected without regard to the integrity of the person or firm under consideration. *In re National Distributors Warehouse*

*Co., Inc.,* 148 B.R. 558, 561 (Bankr.E.D.Ark. 1992). A court must objectively screen applications to retain professionals for even the appearance of impropriety and must not be influenced by the professional's "protestations of good faith." *Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir. 1994). For these reasons, the Trustee's Application must be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Separate Orders will be entered.

###